Thank you, Your Honor, and may it please the Court, I'll reserve five minutes for rebuttal. As you'll recall, when this case was last here, this Court reversed on all three issues pressed by GIS and remanded the case for a new trial principally on damages. Unfortunately, on remand, the District Court committed three even more serious errors, allowing the case to unfold in ways that should have been precluded by the prior proceedings and in particular this Court's mandates. To take just one example, the Court allowed Guardian to present the exact same argument that both the District Court at Rule 50 and the jury rejected in the first trial and that Guardian did not appeal, namely, that Guardian was free to stop performing under the contracts because GIS's DreamGuard sales breached the non-compete. Worse, without any finding that the company that actually sold DreamGuard, CDFC, was GIS's alter ego, the Court affirmatively instructed the jury that GIS not only breached the non-compete, but this is particularly important, I quote, unfairly interfered with Guardian's right to receive the benefits of the contracts. Still worse, the Court refused to tell the jury about the only findings from the earlier judgment that did survive the appeal, namely, that Guardian had unclean hands, waived the breach, and failed to sue on time. Now, for the reasons... Mr. Johnson, may I interrupt you for just a second? Of course, Your Honor. Move the mic. Why isn't that harmless error in view that the affirmative defense was rejected by the jury? And that's exactly what I want to spend the majority of my time on today, Your Honor. I think the answer is twofold. First, juries don't decide damages in a vacuum. If they think that a party has technically breached, but then they hear throughout the case and are actually affirmatively instructed by the Court that the plaintiff who's suing has unfairly deprived the defendant, in this case, Guardian, of the benefits of its bargain, of the benefits of the agreement, they're likely to account for that when they look at damages. The jury is looking at all of the instructions as a whole, so they have to determine if there has been a breach. But they also have to heed this instruction that says GIS acted unfairly. It's the one that breached. It in fact interfered with the ability of Guardian to receive the benefits of the contract. The jury's figure came in much closer to Guardian's number than to ours. You had the judge essentially putting a thumb on the scales. And importantly... But wasn't the jury instructed to calculate... Your argument seems to be that the jury didn't follow the instructions of the judge as to by the unclean hands argument, which they rejected. So let me explain the other piece of my answer, which is that the mitigation aspect of this is critically important. And I'd like to quote from Guardian's own brief at page 42 on this. This is their description of what informed the jury's award. They say the jury's award was based on, quote, conflicting evidence and arguments concerning GIS's lost profits and GIS's failure to implement a purported strategy at minimal cost to mitigate the same. The drumbeat from day one of this trial to day five, openings to closing, was this. If only they had cared about our products. All they cared about were DreamGuard's products. They focused all their attention on DreamGuard. If they had shifted that, they could have avoided damages. Now what does the jury form say on mitigation? It asks the jury, this is at page 40 of the excerpts of record, could GIS have avoided some or all of its economic damages for Guardian's breach of the various agreements with efforts or expenditures that would have been reasonable in light of the circumstances facing GIS at the time? Yes. If you answered yes, go on to say what could they have done or how much could they have, effort would it have taken? Six million. Question seven, did GIS undertake reasonable efforts to avoid some or all of its harm for breach of the agreements? No. They tell you that this was about mitigation and about GIS's failure to do what it needed to do. It was actually all obsessed with DreamGuard when it should have been focused on the exclusive distributorship. And then the jury is told to take account of this in mitigation. And that's exactly what they did. It does not take any sort of speculation to connect the dots on this. Their description of what motivated the jury maps on exactly to what they were told. And bear in mind, this wasn't just the drumbeat of Guardian from day one. You have the actual judge, the imprimatur of the judge saying, hey, I know this is a case for breach of contract by the plaintiff, but the defendant is actually the one who interfered with the rights of the, excuse me, the plaintiff is actually the one that interfered with the rights of the defendants to receive their benefit of the agreement. And this, let me interrupt you once more, I'm sorry. But are you arguing that there was no evidence of lack of mitigation of damages from which the jury could reduce the damages from 12 million to 6 million? Is that your point? I'm arguing that the very theory that Guardian argued for why there was a failure to mitigate was that they focused all their attention on the competing product on DreamGuard and not on Guardian's product. That was their whole theory of the case from day one. And then the jury position is that there was no evidence of mitigation or lack of mitigation on the part of G.I.S. in attempting to sell more of its products by greater efforts. I don't remember that being the record. So what I see, it's important to look at this in the light of G.I.S.'s theory of the case, which is that all these contracts are an aggregate. In late 2013, Guardian says, hey, you know, we're terminating. And then in 2014, they say this in writing. You'll find this at page 1349 of the excerpts of record. They write a memo to G.I.S. and they say, the old contracts held by G.I.S. are no longer applicable or relevant to the current business model. So, of course, naturally, G.I.S. puts on testimony that they were kind of frozen in place. All these contracts have exactly the same language. There was one team that executed all of them. As you know from the first appeal, it was an aggregate situation where you had a course of performance that covered all of the contracts. So their theory of the case was, you know, at that point, we were waiting for the other shoe to drop. And, of course, the other shoe did drop. There were termination notices after this case started to go up on appeal. So their theory was, it didn't make sense for us to invest more money in selling these products. When, of course, Guardian is saying, you know, we're terminating. But their whole theory was, and this should have been completely off the table, six ways to Sunday, claim preclusion, issue preclusion, Rule 50, you pick. Their whole theory of the case from day one was, well, you were focused all on DreamGuard when the jury rejected it and the court rejected that Rule 50A. It should not have been part of the case. I don't know that saying you're focused on DreamGuard is the same thing as saying you breached the contract because of DreamGuard, right? I mean, the jury found for GIS on the breach. So the jury was instructed two things that we think were prejudicial. The first, that there was a breach of the non-compete. But the second, and I really think this is the most important, is that GIS unfairly interfered with Guardian's ability to get the benefits of their bargain. That's at pages 84 and 35 of the record. But if the jury had believed that, wouldn't they have said there's no contract for GIS to win the breach claim on? Like, I just don't see how it fits together. That's a great question. So the contract, there was other stuff in the instructions about how you have to look at these things independently. But that's why I think damages is so important. If you're a jury trying to be faithful to all of the instructions, you're saying, okay, it looks like there was a breach here. We've also been told there's a breach of the non-compete. And we've been told that GIS acted unfairly. Those pieces should have been off the table. So what do we do with that? We find damages and we mitigate because the reason they acted unfairly is that they were off selling DreamGuard when they should have been selling Guardian. And again, you don't have to take my word for it. That's their explanation of what motivated the jury. So there's a logical connection here between, yes, admittedly, they found a breach. But there are obviously numerous cases from this court in which this court has reversed damages verdicts where there were, for example, in the Worf case, defendant's counsel misled the jury in a way that influenced the amount of damages. No issue of liability. Wouldn't we have to speculate to decide that's what they did? I mean, is there any thing that connects the efforts on DreamGuard to the amount that you think the jury improperly reduced the damages amount? Not to the precise amount, Your Honor. But I don't think it's speculation. I think the dots connect because their theory was that we didn't mitigate because we weren't selling their products. We were celebrating DreamGuards. There's a logical connection. And they cut it. They gave us a 50% haircut. So I don't think it's at all speculative. And I think if you're a faithful jury looking at the instructions as a whole, you feel obligated to do something about that. Now, we think this error, which was extraordinarily fundamental and just wrong in so many ways, infected the whole trial. We think the top nine number was likely infected as well. Juries are human. And it's not like liability and damages are hermetically sealed compartments in their minds. But there is a particularly clear connection, I think, given how the jury form reads on mitigation. I would also note on the issue of prejudice, Your Honor, to come back to your original question, that there's prejudice on the Bob's Agreement and there's prejudice on 6B. And you can look at the prejudice as a whole. As to the Bob's Agreement, remember, we got zero damages because the court... So can I ask you about this? Sure. How many damages do you think you should have gotten on the Bob's Agreement if you had won? Our experts said that damages on the Bob's Agreement were, I believe, $875,000. That's what I thought. Okay. That's what I found in the record. So just hypothetically, if we agreed with you about the Bob's Agreement and thought that you should get a remand because maybe you deserve that almost $1 million, the other side has said, don't view our cross-appeal unless you are going to remand. What if we agree with them on the cross-appeal that they're right about the 6B argument? It seems like you would lose $2.7 million if they win on that. So if you might win less than $1 million through a remand on Bob's, but lose $3 million if we agree with them on the cross-appeal, would you rather have us not have you win on Bob's? I'm happy to talk about 6B, Your Honor, and I think they don't get to first base on 6B. It's interesting, 6B has a couple sentences. Whenever they quote it, they quote only the second. Let's listen to the first. In the event GPP should sell or otherwise transfer ownership to another entity, distributor is hereby guaranteed continuous operation under the terms of this agreement so long as adherence is made to the terms outlined therein. Then it goes on to say, should the subsequent ownership of GPP elect to eliminate the distributorship? And not should the ownership of GPP subsequently, some later date, elect it, but should they elect in the event of the transfer of ownership, subsequent ownership shall pay five times the sale. So this is tied to the event. And they waited 13 to 19 years. There's no evidence in the course of dealing that they ever thought that this gave them an out. They came up with it after not only one trial, but it's not even in the pretrial statement, Your Honor. I agree with you that they raised it very, very late, but I have trouble seeing how the condition wasn't met that ownership changed. And it's not like there isn't a harm to them from invoking it because they have to pay you five years of royalties or five years of profits or whatever the word is. So why isn't that possible to do? So let me take waiver first and then I'll talk about the merits. So on waiver, it's a contractual limitation of liability, which under California laws and affirmative defense, it has to be pled in the answer. Nothing there. Whole first trial, nothing, you know, all the way up to the eve of the second trial. Now, they say they referenced it in one brief in July of 2021. And there's a reference, but it's for one purpose. It's to say this supports our reading of the quotas. Nothing about the idea that it's a limitation on the amount of damages. And then it's not in the pretrial order, which does, excuse me, their pretrial statement, which does discuss their position on damages. Nothing about this. So I think they've got really big waiver problems. They're very fundamental. But on the merits, you know, so it actually is tied to, if you look at the text, it's tied to the event of the change. Several of these contracts came into being after that event. And then, you know, but even if even for the others, contract law under California law implies a reasonable period of time. 13 to 19 years is not a reasonable time. And, you know, there's the course of dealing evidence is undisputed. So I don't think they get to first base with 6B. I have about five and a half minutes left. Unless there are questions, I'll reserve the reigner of my time for a while. Thank you very much. Good morning, Your Honors. May it please the Court. Calvin Davis for Defendant Appley and Cross Appellant. I'd like to reserve two minutes for rebuttal on the cross appeal. This is an unusual appeal in which the party who received a $6 million judgment below now complains that because of some alleged errors, the jury below was prejudiced against them, which is, as one of the panels already pointed out, pure speculation and not supported by the evidence in the case or by the jury verdict. There were no errors here. And even if there were errors, clearly, completely harmless and not prejudicial to plaintiff here. Let me just start with the errors. They basically point out two errors. The first error is about the judge applying the prior jury findings to the second trial on Dream Guard. The second error is the application of the 6B limitation of liability. So on the Dream Guard error, the appellant's central contention is that the court should have applied issue or claim preclusion instead of law of the case. And, however, it's very curious to note that in their briefs or today, they never go through the elements of claim or issue preclusion for a very good reason. It's clear they do not meet the elements. This is a case involving, it's the same case, it's an ongoing case. It's not successive cases. In a situation like this where we're dealing with prior orders in the same case on remand, that is clearly law of the case subject to abuse of discretion review. Federal authority is very clear on that. And they've cited no authority to the contrary on that law and law of the case. The jury in the first trial found that in a factual finding that GIS had breached the benefit of the contract. The district court properly on remand applied law of the case and instructed the jury on those findings of fact. What the other side wants to do here is apply issue or claim preclusion. They simply do not meet the elements. For example, under claim preclusion, it only arises under California law if it involves the same cause of action between the same parties after a final judgment on the merits in the first suit. That's the DKN case, California Supreme Court. Here, there is only one suit, no final judgment, not the same cause of action. If we agree with you on prejudice, we don't need to grapple with this, right? Exactly right, Your Honor. I'm just trying to go through it in order, but absolutely. Issue preclusion, same issue, same result. It can't possibly be applicable. It applies after final adjudication of an identical issue, actually litigated and necessarily decided in the first suit and asserted against the party in the first suit. Again, that's the DKN case. Again, no final adjudication, no first or second suit. We're still in one lawsuit. They also make some arguments about when judgments become final, which obviously plays into preclusion. The authority we've cited to the court is that a judgment is final until it's reversed. The judgment here was reversed. It's obviously not a final judgment. They've never cited a single case or any authority to this panel that there is a final judgment while a case is still ongoing and active because no such authority exists. So basically, there is no error. with respect to the district court applying law of the case. The second error they point out, alleged error they point out, is for 6B, which clearly is applicable here. Although counsel read the first sentence, which basically says that the distributor will have the full length of the contract to continue to be a distributor, it's obviously controlled by the second sentence, which says, Should the subsequent ownership of Guardian elect to eliminate the distributorship? Subsequent ownership shall pay distributor amount equal to five times the distributor's purchase of Guardian products during the immediately preceding 12 months. Mr. Davis, may I ask you a question? Sure. Is a $12 million five times the Section 6B amount? No, it isn't. The Section 6B amount is much lower. It is $2.67 million. So there's really no connection between 6B and the jury's eventual verdict. What evidence is there that there was $12 million worth of damage? So the jury listened to evidence from Mr. Robel, plaintiff's damages expert, listened to contrary evidence from Mr. Schultz, our damages expert. They went through all the sales, purchases of furniture warranties, and sales in the various states where GIS had exclusive distributorship rights. And the jury went through the jury instruction on lost profits, specifically gives them the steps to go through to figure out whether there were lost profits. So GIS put on evidence that they had $52 million in lost profits. We put on evidence of significant mitigation to failure to mitigate those damages. Now, tell me about what evidence there was, factual evidence of failure to mitigate. Who gave it? Was it expert testimony? Was it factual testimony? Tell me about that, would you please? I will. It was precipient testimony, factual testimony. It starts with the testimony of Johnny Green from our client, who testified that in his initial meeting with plaintiffs here to talk about these distribution agreements and to express concern that they were not really working these territories very hard. For example, we put on evidence to the jury, Florida is a huge potential territory for these warranties, and they really had only sold about 5% of the state. And that was typical of the other areas in which they had exclusive jurisdiction. In that first meeting, Johnny Green was told by plaintiffs, oh, we consider these contracts to be beachfront property. In other words, we don't have to do anything, they're just going to go up in value and we'll sell them to somebody else later, which was very consistent with their lack of effort. We put evidence on in front of the jury for these territories to show how little work was being exercised in these territories, how little sales were happening compared to what should have been happening. They were essentially resting on their laurels because they believed it was beachfront property. So we had percipient testimony on that subject, which the jury obviously credited. And with the mitigation of damages issue, although counsel tries to somehow argue it's connected to DreamGuard, which is an argument I haven't heard before today, there's no connection between those two things. The mitigation of damages instruction has to do with GIS's lack of time and effort into selling the electronic furniture warranties. DreamGuard is mattress pads. It has nothing to do with the sale of electronic warranties. I understood Mr. Johnson to be saying that your argument was that they spent so much time selling DreamGuard in violation of the exclusivity provision that they didn't spend any time developing their territories for normal sales. That was not the evidence of trial. The evidence of trial and mitigation strictly related to how GIS had not expended sufficient efforts to sell its product in the territories in which they existed, which was completely independent of the DreamGuard issue. So just returning briefly to 6b, we clearly meet the conditions. We have Guardian does not the original owner. We chose to terminate the distribution agreements. Five times sale for 12 months, 2.67 million. GIS had the opportunity to put on contrary evidence. They certainly had people in the courtroom who would be familiar with that. They chose not to. Council states it's an affirmative defense. It's not an affirmative defense. It's part of GIS's burden to proof in proving breach of contract to show they have compensable damage. It's clearly not an affirmative defense. And the only case they really side on this is Carroll Shelby. Carroll Shelby is a very unusual situation where the party only raised limitation of liability after a jury verdict on damages. So clearly so late, highly prejudicial. So the bottom line here is there is no error on permitting the jury to hear the argument on 6b. Okay, turning to the most significant issue here, which is harmless error. The DreamGuard defenses that we raised go strictly to liability. They do not go to damages. That basically the defenses are, we find that we were trying to convince the jury that GIS itself was in breach, material breach. So therefore, you know, we can't be sued for breach of contract. The jury rejected that argument. They heard the instruction from the district court judge about, you know, the violation of the non-compete and the unfair interfering with their ability to get the benefits of the contract. And they looked at the instructions, which say, there may be a breach, but is it material? And they looked at the instructions and obviously determined the breaches were not material or they were independent, not dependent breaches. Otherwise, there is no way they could have reached the conclusion that we were liable for breach of contract. It's impossible. And it's the same thing else is just pure speculation. Again, the damages are different. The breach of contract damages for lost profits on the furniture warranties are different than the lost profits on mattress pads. So they received a favorable verdict on liability and were awarded $12 million, which the jury reduced to 6 million based on mitigation of damages. So that's the law of the case and the prior jury instructions on non-compete clearly had no effect on the jury. As they went through the instructions, they determined not material or independent breach. On 6B, no question that goes to damages and also no question they rejected it. 2.67 million was the number we put in front of the jury based on the evidence provided to the jury based on the sales information we had. The jury awarded 12 million, reduced it to 6. That is not consistent in any way with the 2.67 million. If the jury had awarded us 2.67 million, we'd be in a very different situation here and I certainly would not be arguing harmless error. But that is clearly harmless error. I think I missed... A problem I have with the damages, Mr. Davis, is that if you've got one expert saying 52 million and the other experts saying 1.37 million, is there any evidence that could make it rational to find 12 million? Well, GIS had significant territories throughout the Northeast, Cook County area. And we went through those damages one by one state by state explaining to the jury what they were supposed to have done, what they didn't do. The jury took that all into account and made their own determination. Unless there is some specific evidence beyond speculation that something happened here untoward and they ignored their instructions, I believe we have to give substantial deference to the jury's conclusion in terms of damages. The only argument that we've heard in the briefs for today with respect to prejudice is that somehow the jury felt that GIS were bad actors and this affected their verdict in some way. So that's obviously complete speculation. But not only is it complete speculation, it's belied by the special verdict form where the jury was asked more than once in one way or another, is GIS a bad actor? And every single time said no. One of our defenses was unclean hands, right? Obviously, basically saying, is GIS a bad actor? The jury said, no. No unclean hands, they're not bad actors. On materiality, material contract breach and lack of consideration, that one of the factors is, did GIS act in good faith? Jury said, yes, they acted in good faith. So no unclean hands, they acted in good faith. They awarded them $12 million minus $6 million for mitigation. It doesn't sound like the jury's trying to punish a bad actor there. They're saying, you are the person who has demonstrated that you had breached a contract here. There's no excuse for guardians conduct. And therefore, we're awarding you $6 million. I think I had my numbers wrong with your friend on the other side. It seems like if they win on Bob's agreement and get a remand, they might get close to a million dollars for that breach. But if you win on the 6B issue, it actually changes it by more than 3 million, right? It's 6 million minus 2.7 instead of losing. Okay. Correct, correct. But you have not asked us to reach your 6B cross appeal argument unless we're remanding, right? Correct, your honor. That that's, this is simply a protective cross appeal. The basically, the bottom line of the 6B issue is the jury would have had to ignore their instructions to have the bad actor argument infect what they did as a jury in their deliberations. It's just guesswork on the part of plaintiff here. And it's also belied, as I say, by specific findings the jury made, not finding that GIS were bad actors in this case. Well, as I read the jury form, form B, the question as to unclean hands was never answered. So the jury didn't answer it one way or the other. Well, your honor, I agree. Because they found there's no breach. It's a little confusing, but there are sections where they did answer unclean hands. Um, so, um, if you look at ER 811 on one of the causes of action, this is for, um, this is for implied, this is, um, implied, well, basically for implied breach- That's not the verdict form for this trial though, right? Yeah, exactly, exactly. So, so basically in terms of the findings in this trial, one of our defenses to breach of contract was that they were, had unclean hands. The jury obviously has to reject unclean hands if they're, if they've decided that, that we have breached the contract. That was one of the defenses we raised. So that can't be, that can't be a finding the jury made that they had, they had unclean hands. We don't see that on the verdict form though for this trial. I know that we raised as an, as a, as a, as an affirmative defense, unclean hands, your honor. We know the jury, the jury rejected that. And also with irrespective of that on the materiality of breach and failure of consideration, those both have findings where the jury has to find that GIS acted in good faith. So that's the opposite of being a bad actor. Just briefly on the, um, on the Bob's case, this court did not make a affirmative ruling that there was consideration as a matter of law. It gave some guidelines for the court to use, remanded it back for a retrial, and not just on damages, but for retrying the entire case. The jury heard evidence without restriction from both sides as to whether or not there was an actual contract and whether it was breached. And for the second time in this case, the jury determined there was no breach. And I think we have substantial evidence to, to support that there was no contract and there was no breach. And that, that opinion of the jury should be, should be respected. So, uh, it would be consideration to, uh, refrain from bringing even a frivolous lawsuit that would be a pain to deal with, right? Yes, agreed. As long as there's some basis for claiming there's, there's some basis for correct. So in, in this case, um. I mean, I'm just having trouble understanding why you would have paid the Bob's amounts for no reason at all. Right. So the evidence at trial was that there, we put on evidence that GIS never said in this fifth, basically 15 second meeting on Bob's, they never said, oh, we'll hold back on exercising our exclusive rights to this territory. If you give us money, the testimony we presented was that that never happened. The reason for the deal was that we had done a previous deal with another distributor called Metro. GIS came to us and said, we want the same deal. GIS was an important distributor clearly, but the reason we did it was we wanted to move on in that meeting to dealing with the much more significant issue of DreamGuard. So we spent 15 seconds on it. We moved on to DreamGuard. That's it. And I don't think anybody thought it would be a subject of a trial or a, or a ninth circuit appeal. Now, now for the second time, but the jury heard all that evidence. They heard our evidence that there was no consideration. They heard what we said about how it wasn't a real contract. And the jury credited that information and decided against, decided against, um, decided against, um, uh, just briefly on the cross appeal, the protective cross appeal, the aggregate quotas should, should only be limited to the three contracts. You can't expand it to the five contracts. There was no quota issue about those three contracts at the first appeal. Number two, the group of five contracts weren't terminated until after the first trial. This is the Robel argument. He's trying to establish causation. That's the GIS suffered lost profits from termination of those contracts in 2013, which is five years before the contracts were terminated. And on six feet, it's essentially the same argument. It's also been reserved the rest of my time. Thank you, Mr. Davis, Mr. Johnson. Thank you, Your Honor. May it please the court. The, I'd like to begin with judge Bayer's question about mitigation. Both sides offered competing evidence on mitigation. And of course the experts you'll find our expert report at further excerpts of record three 63 and the testimony beginning at page 359 of the excerpts of record. So both sides offered competing evidence on this. As I noted earlier, the 2014 memo, written memo from a guardian to GIS said, quote, old contracts held by GIS are no longer applicable or relevant to the current business model. So that's the situation based on their own words, not creating a real incentive to invest in that. And then where's the prejudice from? As Mr. Davis admits, he said, mitigation is about lack of time and effort. And he says, oh, that's completely disconnected from DreamGuard. DreamGuard is the reason they gave for the lack of time and effort. They said they're devoting all their efforts to selling this competing product, no effort to selling the guardian products that they're exclusive distributors of. So they're very directly connected. Second, on the question of unclean hands, there's nothing on the jury form this time around about that, as Judge Friedland said. And I would note, I mean, it's really extraordinary that the district court not only says that the findings in our favor from the first round are not to be considered, but the ones in their favor are, they were found to have acted with unclean hands in the first trial. That's unconscionable conduct. And the jury, of course, gets to hear nothing about that, only their side of the story with the judge putting her thumb on that side of the scales. Third, as to the $2.67 million, I want to be clear about this. That number is not so black and white. And here's why. It pertains to the 12 months before the termination. Their $2.67 million number is assuming that only the last contract, the Ohio contract, is in effect. In other words, they say, oh, well, this is an aggregate contract. Let's look at the last 12 months, just Ohio. You get $2.67 million. If we had had the opportunity to explore this during the discovery, for our expert to come up with a different theory, an alternative theory, admittedly, but a theory that, okay, if this is somehow a relevant limitation of liability, the amount of damages you'd get would be very different. Now, I can't point you to anything on the record on that because our expert never had the opportunity to develop that. We cross-examined their expert hold on this. It came out of the blue. But that number, I want to be clear, that's making some very favorable assumptions for them. And if our expert had been able to address it, it would have been a number much more in line with the lead damages theory that Mr. Robel offered. Meaning 52 million. Correct. Again, I don't know exactly what it would have been, but it would have been multiples of 2.67. On the Bob's agreement, a couple of things I'd like to point out. First of all, I direct the court to pages 13 to 25 to 30, which is all the relevant written evidence of this contract. Mr. Green, Guardian's vice president, expressly asked, quote, permission to eliminate the contract. Those are his words. There's no question this contract existed. The way that Guardian was allowed to handle consideration at the second trial is extraordinary. They said, oh, there's no contract. We didn't get anything. Now, in the first appeal, you reversed summary judgment for Guardian. It left a factual issue, admittedly. But that doesn't mean that at the end of the second trial, there isn't an undisputed record that supports us. As you said in the first appeal, this was about accommodating a gripe. The actual existence of the contract is confirmed in their own words from those pages I cited. And the idea that we were just asking to be treated as this other company, the other company, in the end, was not similarly situated to GIS because they bought it out. And so it leaves a question of, you know, OK, they actually bought that company. And it's a different way of, in a sense, you could say paying off what they were owed. That never happened with us. Finally, Unruh Bell. I want to be very clear about his methodology, which was quite a conservative methodology. First of all, it's undisputed that he did not count any damages for any territory before termination in that territory. If you look at further excerpts of record, page 367, he says this. I calculated permanently impaired marginal profits by capitalizing the monthly lost marginal profit at either, one, the time GIS would have achieved a 30% market share if achieved after the agreement termination, or two, the date of the agreement termination. So this directly addresses the causation point. Second, Guardian's expert, Mr. Schultz, conceded that the methodology was proper. We quoted that at page 52 of our brief. And third, it's a very conservative approach given the reasonably foreseeable effects of the first tranche of breaches. This was one big contract. So when that first tranche came, naturally, it affected market share across the board. Unless there are further questions. Hanson, were you planning to answer the arguments on the cross-appeal? Well, I just did on Robul. And 6b is an issue on both sides. So I've sought to address that. If you have any further questions, happy to answer. And the only thing I would say on the question of the five contracts being different, if you look at their own petition for 1292b review, this is a quote. The five agreements, quote, have similar if not identical language regarding the purchase quotas, and Guardian intends to offer the same extrinsic evidence in support of its argument that the agreements contain per territory purchase requirements. Page 123 of the further excerpts of record. That says it all. Thank you, Mr. We urge the court to reverse, send it back for a new trial on damages, and to reject the cross-appeal. Thank you. Thank you. Mr. Davis. Briefly, in order to correct the record, if you look at ER 39, that is where the jury found that GIS did not have unclean hands. So that's just to correct the record. Briefly on the cross-appeal and the issue of Robel's testimony, he has causation backwards, and it wasn't cured by any arguments that were made here today. These group of five contracts that we're talking about were not terminated until after the first trial. He's trying to use his, he's trying to be consistent with his damages analysis at the first trial, even though it no longer makes any sense. And the district court erred in allowing the GIS damages expert to testify that GIS suffered lost profits from the termination of those contracts in 2013, which was five years before the contracts were terminated. He tried to fix this by saying, well, I'm only counting damages as of the date of termination, but that doesn't fix the problem. The breach has to occur and the damages have to flow from the breach. He's saying there was breach, but there weren't any damages that flowed from that until years later. That causation analysis simply doesn't make any sense. And again, the $2.67 million, we've met every element of that. And we believe on the protective cross appeal, the court should have reduced the jury's verdict to $2.67 million. But apart from the protective cross appeal, we're just asking for affirmance of the verdict below. Unless there are other questions. Thank you very much. Thank you. I just want to say that Mr. Johnson and Mr. Davis, you've both made excellent arguments on your respective sides of the case. And it's a difficult case. The panel appreciates your advocacy and we will now submit the case and take it under advisement. And the parties will hear from us in due course. So thanks again. Thank you. Now do we go to the voting?
judges: GOULD, BEA, FRIEDLAND